Laurence M. Rosen, Esq. (SBN 219683)
THE ROSEN LAW FIRM, P.A.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

Counsel for Plaintiffs

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN LECHNER, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>INFUSYSTEM HOLDINGS, INC., ERIC K. STEEN, and JONATHAN P. FOSTER,<br><br>Defendants. | Case No: 2:16-cv-08295(ODW)(AGRx)<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

Lead Plaintiff, Nicoya Capital LLC ("Nicoya") and named plaintiff John Lechner ("Lechner" and together with Nicoya, "Plaintiffs"), by and through their attorneys, individually and on behalf of all other persons similarly situated, alleges the following based upon personal knowledge as to Lead Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Lead Plaintiff's attorneys, which included, among other

things, a review of Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding InfuSystem Holdings, Inc. ("InfuSystem" or the "Company"), analysts' reports and advisories about the Company, interviews with and documents obtained from former employees of the Company, and information readily obtainable on the internet. Lead Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action brought on behalf of a class consisting of all persons and entities that acquired InfuSystem securities on U.S. Exchanges or in U.S. transactions between May 12, 2015 and November 7, 2016, inclusive (the "Class Period"), excluding Defendants and their affiliates, against the Defendants, under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

2. Throughout the Class Period, Defendants InfuSystem, Eric K. Steen ("Steen"), its Chief Executive Officer ("CEO"), President, and Director, and Jonathan P. Foster ("Foster"), its Chief Financial Officer ("CFO") and principal accounting officer from the beginning of the Class Period through August 11, 2016, knowingly or recklessly disseminated materially false and misleading financial statements – financial

statements the Company ultimately restated because they were materially false when the Company first issued them.

3. InfuSystem is a healthcare company headquartered in Madison Heights, Michigan, serving customers in the United States and Canada, from five locations. InfuSystem's core service is selling and renting electronic ambulatory infusion pumps and associated disposable supply kits, both new and used, to oncology clinics, infusion clinics and hospital outpatient chemotherapy clinics to be used in cancer treatment. The Company also provides biomedical recertification, maintenance, and repair services of infusion pumps to oncology practices and alternative care settings such as home care and skilled nursing facilities. It purchases both new and pre-owned pumps from a variety of sources, providing refurbishment as needed, and then sells or rents them. It collects revenues both from third-party payors and direct pay customers.

4. On November 7, 2016, at 7:00 am, prior to the opening of the market, the Company filed a Form 8-K with the SEC ("November 7 8-K"), warning investors not to rely on the financial statements it issued for each of the fiscal quarters ended March 31, 2015 through June 30, 2016, including the Company's 2015 annual, audited financial statements. "[A]fter review and discussion with management and the Company's independent registered public accounting firm, BDO USA, LLP ("BDO")," the Audit Committee of InfuSystem's Board of Directors ("Audit Committee") conceded the material falsity of the financial statements in question,

determining that the Company had overstated its estimated "accounts receivable" collections. In addition, the Audit Committee warned that it was assessing the Company's internal control over financial reporting "to determine if any significant deficiencies or material weaknesses in such controls caused or contributed to any potential adjustments that may be required."

5. On this news, the price of InfuSystem's common stock fell from a November 6, 2016 close of $2.60 per share to a November 7, 2016 close of $1.60 per share on relatively large trading volume.

6. In the November 7 8-K, Defendants attributed the Company's materially false financial statements to a mistake in a formula, having applied an incorrect cash collection percentage to its rentals of infusion pumps to patients, relating to its third-pay payor business. Defendants maintained that "[r]evenue resulting from sales, service and rentals directly billed to health care providers is not impacted by this error," despite that it does not differentiate between direct payors and third party payors in its "accounts receivable" line items on its balance sheets.

7. But even Defendants' disclosure of the Company's false financial statements was a lie. In fact, InfuSystem's overstatements of revenues did not arise solely from a simple formula error, if at all. Indeed, a former employee whom the Company hired specifically to implement controls over credit and collections described a corporate culture at InfuSystem that encouraged and accepted falsification of

accounts receivable for years. In addition, Defendants accepted that the Company's internal controls over financial reporting were ineffective, riddled with material weaknesses that led directly to the Company's materially false financial statements during the Class Period. As Defendants would acknowledge in the amended Annual Report on Form 10-K/A for the year ended December 31, 2015 ("2015 10-K/A") the Company filed with the SEC on December 12, 2016, InfuSystem's internal controls for accounts receivable were inadequate, practically nonexistent, and changed with the whims of the Chief Financial Officer ("CFO"), Defendants Foster.

8. In violation of generally accepted accounting principles ("GAAP"), the Company materially and systemically overstated accounts receivable collections, misapplying payments to incorrect customers and invoices, hiding returns of its products in its financial statements, and failing to write off years-old receivables it had no hope of collecting.

9. Thus, even as they disclosed that it had materially overstated its financial statements, requiring restatement, Defendants failed to disclose their knowing or reckless violations of GAAP with respect to accounts receivable. Rather, they hid the true reason that they had materially overstated the Company's financial results. The Company's stated reason for the unreliability of its financial statements was cover: regardless of whether the Company had applied a correct or incorrect cash collection formula to infusion pump rentals, the underlying accounts receivable numbers for its

rental and sales businesses were materially incorrect, and the resulting financial statements were incorrect.

10. Indeed, Defendants did not restate their financial statements until the former employee they had hired to remedy the woeful state of the Company's accounts receivable threatened to report the Company to the United States.

11. As a direct and proximate result of Defendants' knowing or reckless wrongdoing, Plaintiffs and the Class suffered damages.

## JURISDICTION AND VENUE

12. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 8 240.10b-5).

13. This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

14. Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1391(b), as a substantial part of the conduct complained of herein occurred and the Company conducts business in this District.

15. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

16. As set forth in the accompanying certification, attached hereto as Exhibit A and incorporated by reference herein, Lead Plaintiff Nicoya, purchased InfuSystem common stock during the Class Period, and suffered damages as a result of Defendants' federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

17. As set forth in the accompanying certification, attached hereto as Exhibit B and incorporated by reference herein, named plaintiff Lechner purchased InfuSystem common stock during the Class Period, and suffered damages as a result of Defendants' federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

18. Defendant InfuSystem is a Delaware corporation and headquartered in Madison Heights, Michigan. InfuSystem maintains an office at 10349 Heritage Park Dr., Unit 2, Santa Fe Springs, CA 90670. The Company provides infusion pumps and related products and services for patients in the home, oncology clinics, ambulatory surgery centers, and other sites of care from five locations serving the United States and Canada. InfuSystem securities trade on the New York Stock Exchange ("NYSE") under the ticker symbol "INFU."

19. Defendant Steen was InfuSystem's President and CEO throughout the Class Period, and serves on the Board of Directors. Steen joined InfuSystem on April

1, 2013. During the Class Period, he signed all relevant SEC filings, certifying the Company's financial statements and the material accuracy of its financial condition and results of operations as InfuSystem's Principal Executive Officer.

20. Defendant Foster was InfuSystem's CFO from the beginning of the Class Period through August 11, 2016, when, at the age of 52 – in the midst of the Company's review of its 2015 financial statements and its internal controls – he abruptly resigned after four years at the Company. The Company replaced him with current interim CFO Christopher Downs. Foster joined InfuSystem in March 2012. During the Class Period, he signed all relevant SEC filings, certifying the Company's financial statements and the material accuracy of its financial condition and results of operations as InfuSystem's Principal Financial and Accounting Officer.

21. Defendants Steen and Foster are sometimes referred to herein as the "Individual Defendants."

22. Each of the Individual Defendants:

a. directly participated in the management of the Company;

b. was directly involved in the day-to-day operations of the Company at the highest levels;

c. was privy to confidential proprietary information concerning the Company and its business and operations;

d. was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

e. was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

f. was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company;

g. signed false certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), attesting to the material accuracy of financial statements and effectiveness of the Company's internal controls; and/or

h. approved or ratified false and misleading statements in violation of the federal securities laws.

23. InfuSystem is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

24. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to InfuSystem under *respondeat superior* and agency principles.

25. Defendant InfuSystem and the Individual Defendants are referred to herein, collectively, as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

***Background***

26. InfuSystem claims to be a market leader in providing infusion pumps and related products and services for patients in the home, oncology clinics, ambulatory surgery centers, and other sites of care, from five locations serving the United States and Canada. It records revenue from both third-party payors, principally insurance companies, and direct pay customers.

27. On March 9, 2016, InfuSystem filed with the SEC its Annual Report on Form 10-K for year ended December 31, 2015 ("2015 10-K"), including its audited financial statements for that year. As it had in each financial statement since 2007, the Company purportedly reported accounts receivable on its balance sheet "at the estimated net realizable amounts from patients, third-party payors and other direct pay customers for goods provided and services rendered." Defendants continued, claiming to "perform periodic analyses to assess the accounts receivable balances and record an allowance for doubtful accounts based on the estimated collectability of the accounts such that the recorded amounts reflect estimated net realizable value." Last, Defendants purportedly wrote-off accounts receivable upon determining those accounts were uncollectible – as GAAP required them to do.

28. Thus, while the Company listed different categories of payors who contributed to its "accounts receivable," it stated unequivocally that its accounts receivable reporting included both third party and direct payors in a single calculation, and that its "periodic analyses" and determination of collectability or uncollectability were the same for all types of payors.

29. Further, InfuSystem's statement in its 2015 10-K misrepresented its actual, inadequate accounts receivable procedures. Despite certifying consistently in its quarterly reports for every quarter of 2015 that its financial reporting controls and procedures were effective, the Company effectively had no internal controls in connection with accounts receivables.

30. In November, 2015, Defendant Foster, himself, and Trent N. Smith ("Smith"), the Company's Chief Accounting Officer, Executive Vice President & Corporate Controller throughout the Class Period, hired Former Employee 1 ("FE1")[1], an experienced accounts receivable professional with a background in compliance with SOX. Even before he started at InfuSystem, during the employment interview, Foster and Smith explained to FE1 that InfuSystem's accounts receivable processes were

[1] FE1 was the credit and collections manager for InfuSystem in its Kansas office from early November 2015 until late January 2016. The Kansas office handled receivables for the Company's direct pay customers. FE1 reported to the Company's accounting manager, Alison Ysusi and worked directly with Steen, Foster, and Smith in attempting to develop an effective accounts receivable process.

ineffective and flawed, claiming that the Company was hiring FE1 because it was committed to change. According to FE1, Smith knew there was something dramatically wrong with the receivables, and he and Foster hired FE1 to make changes to conform the Company's processes for recording accounts receivable and booking the allowance for doubtful accounts to GAAP Foster and Smith specifically hired FE1 for his strong SOX compliance background.

31. During FE1's first week at InfuSystem in November, 2015, Defendant Foster prepared and gave to FE1 a list of objectives that included, for the first quarter of 2016, "[d]efin[ing] the role, responsibilities, and objectives of Credit and Collections within the organization" and "[m]anag[ing] and maintain[ing] A/R [accounts receivable] portfolio to identify and resolve billing issues, reconcile unapplied cash, and monitor third party collection activity while maintaining acceptable DSO and aging levels."

32. On approximately January 5, 2016, FE1 prepared and disseminated within the Company a list of goals and objectives for InfuSystem's credit, customer service, and sales departments to attempt to establish an organized accounts receivable process for InfuSystem, entitled "Accounts Receivable: A shared responsibility between Credit, Customer Service, and Sales." He also prepared a template for the sales, customer service, shipping, service, and warehousing teams to use in identifying obstacles.

33. On January 5, 2016, Defendant Steen met with FE1. They discussed FE1's plans for reforming the accounts receivable process. FE1 informed Steen about the problems that FE1 encountered. Later, describing his meeting with Defendant Steen to Smith, FE1 wrote in an email sent on January 5 at 4:06 p.m.:

> We spoke about the need for customer requirements, processes and procedures, and rethinking how we do business. I told him my biggest concern was getting support from the C team. I then asked him if he would support what we are trying to do and he said yes….We were in there for about 20 minutes and had a great discussion."

34. From his time at the Company, FE1 learned and witnessed that – Company-wide – both before and during the Class Period, InfuSystem's internal controls over financial reporting, Company-wide, were ineffective, materially inadequate. The Company's internal controls, FE1 further recalled, did not comply with SOX requirements, disabling Defendants from preparing and certifying GAAP compliant financial statements. FE1 recalled that Defendants Steen and Foster were aware of the material weaknesses in the Company's internal controls well before his hiring. Indeed, Defendants Steen and Foster hired FE1 specifically to resolve material weaknesses in the Company's accounting for accounts receivable and allowance for doubtful accounts, weaknesses of which both were aware.

35. GAAP, ASC 310, required that InfuSystem record accounts receivable at their net realizable value. GAAP required Defendants to estimate net realizable value

of revenues based on two measures: (1) contractual allowances and (2) accounts receivable net of an allowance for doubtful accounts. Direct payor revenue recognition does not involve contractual allowances and thus is based only on accounts receivable net of an allowance for doubtful accounts. Accurate accounts receivable estimations, however, rely upon the integrity of InfuSystem's actual accounts receivable.

36. According to FE1, contrary to GAAP, InfuSystem systematically overstated its accounts receivable. Upon arriving at InfuSystem, FE1 found that the Company routinely categorized bills in "aging buckets," categories of invoices based on the number of days that had elapsed since the Company invoiced a payor. While the Company maintained the pretense of assigning accounts receivable to standard aging buckets – 1-30 days old, 30-60 days old, 60-90 days old, 90-120 days old, and 120 days or older – according to FE1, GAAP and accepted practice required the Company to write off receivables as uncollectible that were 120 days or older.

37. InfuSystem, however, did not write off bills aged past 120 days as bad debt. Rather, according to FE1, the Company had no procedure at all for writing off bad debt in any of its aging buckets. FE1 discovered three year old receivables that the Company had not written off.

38. Worse, FE1 was very concerned that more than 50% of the Company's accounts receivable were over 90 days old, a staggering amount.

39. FE1 learned the extent of the Company's inadequate controls over accounts receivable early in his tenure, when he attempted to identify InfuSystem's process for removing uncollectible bills from accounts receivable. Alison Ysusi ("Ysusi"), FE1's direct supervisor and the Company's accounting manager, told him that write-offs of uncollectible, bad debt required the approval of the Company's general counsel, Sean Schembri ("Schembri"). Schembri, however, denied to FE1 that the general counsel's function had anything whatsoever to do with writing off bad debt.

40. Rather, according to FE1, Ysusi told FE1 that the accounting staff did not write off uncollectible accounts receivable unless Defendant Foster instructed them to write it off. Ysusi stated to FE1, "we put in here whatever the CFO tells us to put in here." With respect to the Company's bad debt reserve formula, Ysusi further stated that "sometimes it's this and sometimes it's that." As a result, according to FE1, Defendants had materially and falsely inflated the Company's accounts receivable for years."

41. FE1 spoke personally with Defendants Foster and Smith concerning the Company's inappropriate failure to write off uncollectible receivables. Defendant Foster admitted that he knew that the Company had failed and continued to fail to do so, and that it was one of the issues that he wanted FE1 to correct.

42. Still further, according to FE1, InfuSystem lacked any proper procedure for reconciling unapplied cash and monitoring third party collection activity. FE1

discovered that personnel responsible for billing routinely billed payors and applied payments and credits to outstanding invoices manually, outside of the Company's electronic billing system. Indeed, according to FE1, accounting staff deliberately misapplied incoming cash to incorrect invoices with the specific intent to reduce the percentage of aged delinquent bills.

43. FE1 stated that billing and collections staff essentially handled unapplied cash in whatever way they could devise to reduce the high number of bills that were over 120 days old. In direct violation of GAAP and of Kansas state law, InfuSystem accounting personnel applied payments for newer invoices to older, outstanding invoices to the same customer without customer consent. This practice, alone, compromised the integrity of the Company's accounts receivable and the allowance for doubtful accounts, as bills the Company improperly and illegally applied cash to aged invoices it should have written off.

44. Worse still, the Company billed multiple clients on the same invoice, then misapplying one customer's payment to the older, unpaid bill of another customer

45. Another way the Company failed adequately to age and write off bad debt related to equipment rentals. According to FE1, the Company simply continued to bill and accrue accounts receivable for customers who had rented since 2007 or 2008, but who had failed to pay for several years. The Company continued to invoice rental payments on those accounts in 2015.

46. For example, as FE1 began the process of confronting the accounts receivable morass he discovered, he interacted with a major client who complained that it never received four invoices, it paid another but InfuSystem did not apply the payment to that customer's account, and InfuSystem applied returns on one invoice to a different invoice. To avoid alienating that customer, the Company forgave bills that were legitimately owed, in order to avoid alienating an important customer. After FE1 forwarded a string of emails between himself and the customer to the Company's general counsel, Schembri, Schembri replied in an email sent to FE1 on December 8, 2015 at 10:16 a.m.: "We have to get the billing process straightened out immediately – or we will continue to find ourselves potentially forgiving amounts legitimately owed to us just to keep a customer's business." In FE1's experience in credit and collections, billing practices like those experienced by this customer would lead to even higher rates of delinquency. FE1 stated: "When the billing doesn't equal what the customers were expecting, customers are not going to pay that 90% of the time."

47. FE1 also quickly saw that the Company also routinely maintained bad debts on the books, making it impossible to generate accurate collections forecasts.

48. FE1 directly told Defendant Steen that InfuSystem's accounts receivables were seriously overinflated, creating serious potential liabilities and consequences for the Company. Defendant Steen responded that he knew.

49. On two separate occasions, FE1 also raised the problems with the Company's accounts receivable practices with InfuSystem's Internal Auditor. The Internal Auditor responded that he knew there were problems, replying, "I know, I just don't have the time to get to it, everything's so screwed up here, I'll get to it eventually, but I can't get to it right now." He indicated that he had other priorities.

50. The Company's serious problems with accounts receivable and bad debt stemmed, in part, from InfuSystem's failure routinely to perform due diligence prior to extending credit to customers, itself leading to a material number of delinquent accounts. Very few accounts were reviewed for creditworthiness at all. For example, according to FE1, one customer had declared bankruptcy and then simply changed its name and sought credit under the new name. InfuSystem extended the credit and then that customer declared bankruptcy again.

51. As FE1 attempted to implement internal controls over accounts receivables, he updated Smith on the bad business practices he encountered. When he questioned why two separate invoices were created for one item, Brittany McVey, the Customer Service Supervisor, responded in an email sent on December 23, 2015 at 10:51 a.m. that it was to "avoid doing returns in the system." Questioning why the Company would not want returns entered into the system, on December 23, 2015 at 12:03 p.m., FE1 emailed Smith:

> "As I get further in to cleaning up the A/R, I am running in to things (like doing manual invoices to not have to put returns in the system) that strike me as being a bit unusual. I just want to make sure that I am heading down the right path by questioning these types of things."

Smith responded, at 12:31 p.m.:

> "Thanks for the update. Now you know my pain. Things have always been a certain way in KS and a lot of times it's not the totally correct way to do something. They tend to look at things as what's the fastest way.....versus what's the correct way."

52. Despite management's early statements that it wanted to correct accounts receivable issues, FE1 soon ran into resistance at the senior executive level to his attempt to bring accounts receivables practices in line with SOX requirements. On January 15, 2016, in an email sent at 11:42 a.m., he circulated a presentation on best practices in accounts receivables to Smith, as well as several other InfuSystem employees, including Dan Wassall, Vice President of Finance and Operations ("Wassall"). After making a presentation to staff involved in invoicing, on January 19, 2016 at 8:51 a.m., FE1 sent an email following up with Wassall and an employee reporting to him, asking for a status update in modifying a credit request form that would be part of a formalized process for processing returns.

53. On January 20, 2016, at 8:57 a.m., Wassall responded that this was "probably not at the top of the priority list." After FE1 asked for a target date for preparing the form, on January 20, 2016 at 11:24 a.m. Wassall advised FE1 that "[y]our

requests may potentially be met with opposition or hesitation if the pace is too strong or the demands feel excessive/aggressive."

54. FE1 left his position less than two weeks later, frustrated by the Company's resistance to correcting its accounts receivable procedures processes so that the Company could accurately record accounts receivable and the necessary allowance and report materially accurate financial statements. In addition, to FE1, Defendants Steen and Foster refused to treat the very problems they tasked FE1 to correct as urgent or even important.

55. According to FE1, Steen and Foster understood the severity of the issues with the Company's accounts receivable, but ultimately refused to set standards for the Company in which anything other than honest and accurate billing and financial reporting would be considered unacceptable. Like their employees in operations, billing, and collections, Steen and Foster were invested in a system that resulted in inaccurate financial reports but made the Company and themselves look better, artificially inflating the value of its stock and misleading investors.

56. FE1 left InfuSystem on January 29, 2016. Before resigning, FE1 saved documents showing that the Company was not following accepted practices for billing and accounts receivable]. At the time that FE1 resigned, Janet Quiring, a human resources generalist at InfuSystem assured him that any request by another company

for an employment verification would only include his date of hire, salary, and date of termination.

57. Soon after leaving his position, FE1 contacted the U.S. Department of Labor and spoke with an investigator at the Region VII Whistleblower Protection Program. After he provided the investigator with supporting documents, including those appended as exhibits to this Amended Complaint, the investigator recommended that FE1 contact the SEC to report his concerns about the Company misstating its revenues and violating state laws.

58. On March 12, 2016, before InfuSystem announced the inadequacy of its internal controls and restated its financial statements, FE1 learned from a placement agency that when the agency called InfuSystem for an employment verification, the Company employee who took the call made disparaging comments about him. FE1 emailed the Company's Human Resources department, writing that he had communicated with a whistleblower investigator from the U.S. Department of Labor concerning InfuSystem's questionable business practices regarding SOX requirements. In an email sent on March 12, 2016 at 8:59 a.m., FE1 informed the Company that he had shared multiple documents with the Department of Labor investigator who referred him to the SEC:

> I was told by Janet that [an employment verification] would [contain] date of hire, salary, date of termination and nothing more. I have two people that are willing to provide proof that

> the references that the Lenexa location gave went far beyond those parameters and that the verification was derogatory and inflammatory in nature.
>
> There is another company that is going to be contacting InfuSystem for employment verification. Once again, I am going to ask that you please reiterate the information that will be provided for employment verification under InfuSystem corporate policies….
>
> Below is an email exchange between me and a Whistleblower Investigator for the Department of Labor. I had provided [the investigator] with multiple documents/emails that show questionable business practices around SOX requirements….I was told that I have two options; file a whistleblower lawsuit and/or report my information and documentation around SOX violations to the SEC in writing to their website outlined below. This is not something that I want to do. I would prefer to work together around InfuSystem providing employment verifications within the standards that Janet explained during my exist interview.

To this email, FE1 attached two emails from the Department of Labor investigator, recommending that he report to the SEC his concerns about the Company's material internal control weaknesses with respect to accounts receivable and allowances thereto. It was problems with those very accounts that caused the Company ultimately to restate its financial statements.

## FALSE AND MISLEADING STATEMENTS AND OMISSIONS

***Defendants Filed False and Misleading Financial Statements***

59. The Class Period begins on May 12, 2015, when the Company filed a Form 10-Q for the quarter ended March 31, 2015 (the "Q1 2015 10-Q") with the SEC,

signed by Defendants Steen and Foster, which provided the Company's first quarter 2015 financial results and position and stated that the Company's internal control over financial reporting was effective as of March 31, 2015. Appended as Exhibits to the Q1 2015 10-Q were signed SOX certifications from Defendants Steen and Foster, attesting to the accuracy of the financial statements, effectiveness of internal controls, and that all fraud was disclosed.

60. Attached to the Q1 2015 10-Q, the Company appended the certification of Defendants Steen and Foster, stating:

> 1. I have reviewed this quarterly report on Form 10-Q of InfuSystem Holdings, Inc.;
>
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
>
> 4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and we have:

a. designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b. designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c. evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d. disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

> a. all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
>
> b. any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

61. In addition, the Q1 2015 10-Q appended the certification of Defendants Steen and Foster pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, stating:

> Pursuant to section 906 of the Sarbanes-Oxley Act of 2002 (subsections (a) and (b) of section 1350, chapter 63 of title 18, United States Code), the undersigned officer of InfuSystem Holdings, Inc., a Delaware corporation (the "Company"), does hereby certify, to such officer's knowledge, that:
>
> The quarterly report on Form 10-Q for the quarter ended March 31, 2015 (the "Form 10-Q") of the Company fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended, and information contained in the Form 10-Q fairly presents, in all material respects, the financial condition and results of operations of the Company.

62. The Q1 2015 10-Q was materially false and misleading because Defendants knew or recklessly disregarded that the Company had materially misstated its financial statements for the first quarter of 2015, as the Company later admitted

when it restated its financial statements, overstating revenues and pre-tax income by approximately $173,000, as follows:

| Consolidated Balance Sheet: | March 31, 2015 As Previously Reported | | Adjustments | | As Restated | |
|---|---|---|---|---|---|---|
| Accounts receivable, net | $ | 11,498 | $ | (173) | $ | 11,325 |
| Total Current Assets | | 20,082 | | (173) | | 19,909 |
| Deferred income taxes | | 14,143 | | 69 | | 14,212 |
| Total Assets | | 87,466 | | (104) | | 87,362 |
| Retained deficit | | (44,119) | | (104) | | (44,223) |
| Total Stockholders' Equity | | 46,325 | | (104) | | 46,221 |
| Total Liabilities and Stockholders' Equity | $ | 87,466 | $ | (104) | $ | 87,362 |

| Consolidated Statement of Operations: | Three months ended March 31, 2015 As Previously Reported | | Adjustments | | As Restated | |
|---|---|---|---|---|---|---|
| Net revenues: | | | | | | |
| Rentals | $ | 15,139 | $ | (173) | $ | 14,966 |
| Net revenues | | 16,725 | | (173) | | 16,552 |
| Gross profit | | 12,089 | | (173) | | 11,916 |
| Operating income | | 1,552 | | (173) | | 1,379 |
| Loss before income taxes | | (700) | | (173) | | (873) |
| Income tax benefit | | 285 | | 69 | | 354 |
| Net loss | | (415) | | (104) | | (519) |
| Net loss per share: | | | | | | |
| Basic | $ | (0.02) | $ | — | $ | (0.02) |
| Diluted | $ | (0.02) | $ | — | $ | (0.02) |

47

63. Further, the Q1 2015 10-Q was materially false and misleading because, directly contrary to the certifications of Defendants Steen and Foster, Defendants knew or were reckless in not knowing that Defendants, as they admitted in the 2015 10-K/A:

> did not maintain an effective control environment to allow for the accurate review and filing of our financial statements primarily attributable to the following factors:

- We did not have adequate processes or policies in place to enable members of our management team to timely review the detailed calculation of accounts receivable collections and contractual allowance reserves;

- We did not have controls designed to validate the completeness and accuracy of underlying data used in the contractual allowance account reconciliation and in the determination of this significant estimate and, as a result, material errors were later identified in the underlying calculation used to support this significant estimates; and

- We did not have an adequate process or appropriate controls in place to support the accurate reporting of our financial results and disclosures on our Form 10-K.

One or more of the foregoing control deficiencies contributed to the restatement of our consolidated financial statements for the fiscal year ended December 31, 2015 and for each of the quarterly periods from March 31, 2015 to June 30, 2016. Additionally, the foregoing control deficiencies could result in material misstatements of these consolidated financial statements that would not be prevented or detected. Accordingly, management has determined that these control deficiencies resulted in the material weakness, as set forth above. Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

64. On August 13, 2015, the Company filed a Form 10-Q for the quarter ended June 30, 2015 (the "Q2 2015 10-Q") with the SEC, signed by Defendants Steen and Foster, which provided the Company's first quarter 2015 financial results and position

and stated that the Company's internal control over financial reporting was effective as of June 30, 2015. Defendants Steen and Foster also signed the Q2 2015 10-Q. Appended as Exhibits to the Q2 2015 10-Q were signed SOX certifications from Defendants Steen and Foster, substantially identical to those in the Q1 2015 10-Q, reproduced in their entirety above in ¶¶ 60 and 61 and incorporated herein, attesting to the accuracy of the financial statements, effectiveness of internal controls, and that all fraud was disclosed.

65. The Q2 2015 10-Q was materially false and misleading because Defendants knew or recklessly disregarded that the Company had materially misstated its financial statements for the second quarter of 2015, as the Company later admitted when it restated its financial statements, overstating revenues and pre-tax income by approximately $234,000. The effects of this overstatement were shown as follows in the 2015 10-K/A:

| | June 30, 2015 | | |
|---|---|---|---|
| **Consolidated Balance Sheet:** | **As Previously Reported** | **Adjustments** | **As Restated** |
| Accounts receivable, net | $ 12,304 | $ (407) | $ 11,897 |
| Total Current Assets | 18,289 | (407) | 17,882 |
| Deferred income taxes | 13,878 | 161 | 14,039 |
| Total Assets | 91,779 | (246) | 91,533 |
| Retained deficit | (43,336) | (246) | (43,582) |
| Total Stockholders' Equity | 47,508 | (246) | 47,262 |
| Total Liabilities and Stockholders' Equity | $ 91,779 | $ (246) | $ 91,533 |

| | Three months ended June 30, 2015 | | | Six months ended June 30, 2015 | | |
|---|---|---|---|---|---|---|
| **Consolidated Statement of Operations:** | **As Previously Reported** | **Adjustments** | **As Restated** | **As Previously Reported** | **Adjustments** | **As Restated** |

| | | | | | | |
|---|---|---|---|---|---|---|
| Net revenues: | | | | | | |
| Rentals | $ 15,616 | $ (234) | $15,382 | $ 30,755 | $ (407) | $30,348 |
| Net revenues | 17,170 | (234) | 16,936 | 33,895 | (407) | 33,488 |
| Gross profit | 11,854 | (234) | 11,620 | 23,943 | (407) | 23,536 |
| Operating income | 1,317 | (234) | 1,083 | 2,869 | (407) | 2,462 |
| Income (loss) before income taxes | 930 | (234) | 696 | 230 | (407) | (177) |
| Income tax (expense) benefit | (147) | 93 | (54) | 138 | 161 | 299 |
| Net income (loss) | 783 | (141) | 642 | 368 | (246) | 122 |
| Net income (loss) per share: | | | | | | |
| Basic | $ 0.03 | $ — | $ 0.03 | $ 0.02 | $ (0.01) | $ 0.01 |
| Diluted | $ 0.03 | $ — | $ 0.03 | $ 0.02 | $ (0.01) | $ 0.01 |

66. Further, the Q2 2015 10-Q was materially false and misleading because, directly contrary to the certifications of Defendants Steen and Foster, Defendants knew or were reckless in not knowing that Defendants, as they admitted in the 2015 10-K/A:

> did not maintain an effective control environment to allow for the accurate review and filing of our financial statements primarily attributable to the following factors:
>
> • We did not have adequate processes or policies in place to enable members of our management team to timely review the detailed calculation of accounts receivable collections and contractual allowance reserves;
>
> • We did not have controls designed to validate the completeness and accuracy of underlying data used in the contractual allowance account reconciliation and in the determination of this significant estimate and, as a result, material errors were later identified in the underlying calculation used to support this significant estimates; and
>
> • We did not have an adequate process or appropriate controls in place to support the accurate reporting of our financial results and disclosures on our Form 10-K.
>
> One or more of the foregoing control deficiencies contributed to the restatement of our consolidated financial statements for the fiscal year ended December 31, 2015 and for each of the quarterly periods from March 31, 2015 to June 30, 2016.

> Additionally, the foregoing control deficiencies could result in material misstatements of these consolidated financial statements that would not be prevented or detected. Accordingly, management has determined that these control deficiencies resulted in the material weakness, as set forth above. Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

67. On November 12, 2015, the Company filed a Form 10-Q for the quarter ended September 30, 2015 (the "Q3 2015 10-Q") with the SEC, which provided the Company's third quarter 2015 financial results and position and stated that the Company's internal control over financial reporting was effective as of September 30, 2015. The Q3 2015 10-Q was signed by Defendants Steen and Foster. The Q3 2015 10-Q contained signed SOX certifications by Defendants Steen and Foster, substantially identical to those in the Q1 2015 10-Q, reproduced in their entirety above in ¶¶ 60 and 61 and incorporated herein, attesting to the accuracy of the financial statements, effectiveness of internal controls, and that all fraud was disclosed.

68. The Q3 2015 10-Q was materially false and misleading because Defendants knew or recklessly disregarded that the Company had materially misstated its financial statements for the third quarter of 2015, as the Company later admitted when it restated its financial statements, overstating revenues and pre-tax income by

approximately $381,000. The effects of this overstatement were shown as follows in the 2015 10-K/A:

| Consolidated Balance Sheet: | September 30, 2015 As Previously Reported | Adjustments | As Restated |
|---|---|---|---|
| Accounts receivable, net | $ 13,584 | $ (788) | $ 12,796 |
| Total Current Assets | 19,556 | (788) | 18,768 |
| Deferred income taxes | 12,944 | 311 | 13,255 |
| Total Assets | 93,777 | (477) | 93,300 |
| Retained deficit | (41,968) | (477) | (42,445) |
| Total Stockholders' Equity | 48,998 | (477) | 48,521 |
| Total Liabilities and Stockholders' Equity | $ 93,777 | $ (477) | $ 93,300 |

| Consolidated Statement of Operations: | Three months ended September 30, 2015 As Previously Reported | Adjustments | As Restated | Nine months ended September 30, 2015 As Previously Reported | Adjustments | As Restated |
|---|---|---|---|---|---|---|
| Net revenues: | | | | | | |
| Rentals | $ 16,849 | $ (381) | $16,468 | $ 47,604 | $ (788) | $46,816 |
| Net revenues | 18,692 | (381) | 18,311 | 52,587 | (788) | 51,799 |
| Gross profit | 13,258 | (381) | 12,877 | 37,201 | (788) | 36,413 |
| Operating income | 2,711 | (381) | 2,330 | 5,580 | (788) | 4,792 |
| Income (loss) before income taxes | 2,326 | (381) | 1,945 | 2,556 | (788) | 1,768 |
| Income tax (expense) benefit | (957) | 150 | (807) | (819) | 311 | (508) |
| Net income (loss) | 1,369 | (231) | 1,138 | 1,737 | (477) | 1,260 |
| Net income (loss) per share: | | | | | | |
| Basic | $ 0.06 | $ (0.01) | $ 0.05 | $ 0.08 | $ (0.02) | $ 0.06 |
| Diluted | $ 0.06 | $ (0.01) | $ 0.05 | $ 0.08 | $ (0.02) | $ 0.06 |

69. Further, the Q3 2015 10-Q was materially false and misleading because, directly contrary to the certifications of Defendants Steen and Foster, Defendants knew or were reckless in not knowing that Defendants, as they admitted in the 2015 10-K/A:

> did not maintain an effective control environment to allow for the accurate review and filing of our financial statements primarily attributable to the following factors:
>
> • We did not have adequate processes or policies in place to enable members of our management team to

> timely review the detailed calculation of accounts receivable collections and contractual allowance reserves;
>
> • We did not have controls designed to validate the completeness and accuracy of underlying data used in the contractual allowance account reconciliation and in the determination of this significant estimate and, as a result, material errors were later identified in the underlying calculation used to support this significant estimates; and
>
> • We did not have an adequate process or appropriate controls in place to support the accurate reporting of our financial results and disclosures on our Form 10-K.
>
> One or more of the foregoing control deficiencies contributed to the restatement of our consolidated financial statements for the fiscal year ended December 31, 2015 and for each of the quarterly periods from March 31, 2015 to June 30, 2016. Additionally, the foregoing control deficiencies could result in material misstatements of these consolidated financial statements that would not be prevented or detected. Accordingly, management has determined that these control deficiencies resulted in the material weakness, as set forth above. Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

70. On March 9, 2016, the Company filed the 2015 10-K with the SEC, which provided the Company's year-end financial results and position and stated that the Company's internal control over financial reporting was effective as of December 31, 2015. The 2015 10-K was signed by Defendants Steen and Foster. The 2015 10-K

contained signed SOX certifications by Defendants Steen and Foster, substantially identical to those in the Q1 2015 10-Q, reproduced in their entirety above in ¶¶ 60 and 61 and incorporated herein, attesting to the accuracy of the financial statements, effectiveness of internal controls, and that all fraud was disclosed.

71. The 2015 10-K was materially false and misleading because Defendants knew or recklessly disregarded that the Company had materially misstated its financial statements for the fourth quarter of 2015, as the Company later admitted when it restated its financial statements, overstating revenues and pre-tax income by approximately $796,000, bringing the total of overstated revenues in 2015 to approximately $1,584,000. The effects of this overstatement were shown as follows in the 2015 10-K/A, for the fourth quarter of 2015 and the full year, respectively:

| | Three months ended December 31, 2015 | | | Twelve months ended December 31, 2015 | | |
|---|---|---|---|---|---|---|
| **Consolidated Statement of Operations:** | **As Previously Reported** | **Adjustments** | **As Restated** | **As Previously Reported** | **Adjustments** | **As Restated** |
| Net revenues: | | | | | | |
| Rentals | $ 16,932 | $ (796) | $16,136 | $ 64,536 | $ (1,584) | $62,952 |
| Net revenues | 19,538 | (796) | 18,742 | 72,125 | (1,584) | 70,541 |
| Gross profit | 13,983 | (796) | 13,187 | 51,184 | (1,584) | 49,600 |
| Operating income | 3,284 | (796) | 2,488 | 8,864 | (1,584) | 7,280 |
| Income (loss) before income taxes | 3,017 | (796) | 2,221 | 5,573 | (1,584) | 3,989 |
| Income tax (expense) benefit | (1,011) | 315 | (696) | (1,830) | 626 | (1,204) |
| Net income (loss) | 2,006 | (481) | 1,525 | 3,743 | (958) | 2,785 |
| Net income (loss) per share: | | | | | | |
| Basic | $ 0.09 | $ (0.02) | $ 0.07 | $ 0.17 | $ (0.04) | $ 0.13 |
| Diluted | $ 0.09 | $ (0.02) | $ 0.07 | $ 0.16 | $ (0.04) | $ 0.12 |

| **Consolidated Balance Sheet:** | **As Previously Reported** | **Adjustments** | **As Restated** |
|---|---|---|---|

| | | | |
|---|---|---|---|
| Accounts receivable, net | $ 14,206 | $ (1,584) | $ 12,622 |
| Total Current Assets | 20,544 | (1,584) | 18,960 |
| Deferred income taxes | 11,502 | 626 | 12,128 |
| Total Assets | 96,449 | (958) | 95,491 |
| Retained deficit | (39,962) | (958) | (40,920) |
| Total Stockholders' Equity | 51,278 | (958) | 50,320 |
| Total Liabilities and Stockholders' Equity | 96,449 | (958) | 95,491 |
| **Consolidated Statement of Operations:** | | | |
| Net revenues: | | | |
| Rentals | 64,536 | (1,584) | 62,952 |
| Net revenues | 72,125 | (1,584) | 70,541 |
| Gross profit | 51,184 | (1,584) | 49,600 |
| Operating income | 8,864 | (1,584) | 7,280 |
| Income (loss) before income taxes | 5,573 | (1,584) | 3,989 |
| Income tax (expense) benefit | (1,830) | 626 | (1,204) |
| Net income (loss) | 3,743 | (958) | 2,785 |
| Net income (loss) per share: | | | |
| Basic | $ 0.17 | $ (0.04) | $ 0.13 |
| Diluted | $ 0.16 | $ (0.04) | $ 0.12 |
| **Consolidated Statement of Stockholders' Equity:** | | | |
| Net income (loss) | 3,743 | (958) | 2,785 |
| Total Stockholder's Equity | 51,278 | (958) | 50,320 |
| **Consolidated Statement of Cash Flow:** | | | |
| Net income (loss) | 3,743 | (958) | 2,785 |
| Deferred income tax expense | 1,763 | (626) | 1,137 |
| Accounts receivable | $ (9,140) | $ 1,584 | $ (7,556) |

72. Further, the 2015 10-K was materially false and misleading because, directly contrary to the certifications of Defendants Steen and Foster, Defendants knew or were reckless in not knowing that Defendants, as they admitted in the 2015 10-K/A:

> did not maintain an effective control environment to allow for the accurate review and filing of our financial statements primarily attributable to the following factors:
>
> • We did not have adequate processes or policies in place to enable members of our management team to timely review the detailed calculation of accounts receivable collections and contractual allowance reserves;
>
> • We did not have controls designed to validate the completeness and accuracy of underlying data used in the contractual allowance account reconciliation and in the

> determination of this significant estimate and, as a result, material errors were later identified in the underlying calculation used to support this significant estimates; and
>
> • We did not have an adequate process or appropriate controls in place to support the accurate reporting of our financial results and disclosures on our Form 10-K.
>
> One or more of the foregoing control deficiencies contributed to the restatement of our consolidated financial statements for the fiscal year ended December 31, 2015 and for each of the quarterly periods from March 31, 2015 to June 30, 2016. Additionally, the foregoing control deficiencies could result in material misstatements of these consolidated financial statements that would not be prevented or detected. Accordingly, management has determined that these control deficiencies resulted in the material weakness, as set forth above. Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

73. In the 2015 10-K, InfuSystem stated, with respect to its process for writing off bad debt:

> Accounts receivable are reported at the estimated net realizable amounts from patients, third-party payors and other direct pay customers for goods provided and services rendered. The Company performs periodic analyses to assess the accounts receivable balances. It records an allowance for doubtful accounts based on the estimated collectability of the accounts such that the recorded amounts reflect estimated net realizable value. Upon determination that an account is uncollectible, the account is written-off and charged to the allowance.

> Accounts receivable are reduced by an allowance for amounts that could become uncollectible in the future. The Company's estimate for its allowance for doubtful accounts is based upon management's assessment of historical and expected net collections. Due to continuing changes in the health care industry and third-party reimbursement, it is possible that management's estimates could change in the near term, which could have a material impact on the Company's business, financial position, results of operations and cash flows.
>
> Following is an analysis of the allowance for doubtful accounts for the Company for the years ended December 31 (in thousands):

| | Balance at beginning of Year | Charged to costs and expenses | Deductions (1) | Balance at end of Year |
|---|---|---|---|---|
| Allowance for doubtful accounts — 2015 | $ 4,739 | $ 5,234 | $ (5,236) | $4,737 |
| Allowance for doubtful accounts — 2014 | $ 4,774 | $ 5,774 | $ (5,809) | $4,739 |

(1) Deductions represent the write-off of uncollectible account receivable balances.

74. The preceding was materially false and misleading because Defendants knew or were reckless in not knowing that, as FE1 described, the Company had no system for writing off bad debt, keeping uncollectible accounts on its books for years, leading to its accounts receivable and net revenues being materially overstated.

75. On May 10, 2016, the Company filed a Form 10-Q for the quarter ended March 31, 2016 (the "Q1 2016 10-Q") with the SEC, which provided the Company's first quarter 2016 financial results and position, and stated that the Company's internal control over financial reporting was effective as of March 31, 2016. The Q1 2016 10-Q was signed by Defendants Steen and Foster. The Q1 2016 10-Q contained signed

SOX certifications by Defendants Steen and Foster, substantially identical to those in the Q1 2015 10-Q, reproduced in their entirety above in ¶¶ 60 and 61 and incorporated herein, attesting to the accuracy of the financial statements, effectiveness of internal controls, and that all fraud was disclosed.

76. The Q1 2016 10-Q was materially false and misleading because Defendants knew or recklessly disregarded that the Company had materially misstated its financial statements for the first quarter of 2016, as the Company later admitted when it restated its financial statements, overstating revenues and pre-tax income by approximately $750,000. The effects of this overstatement were shown in the amendment to the Company's quarterly reports on Form 10-Q/A for the fiscal quarter ended March 31, 2016 (the "Q1 2016 10-Q/A") that InfuSystem later filed on December 12, 2016 as follows:

| | March 31, 2016 | | |
|---|---|---|---|
| | As Previously Reported | Adjustment | As Restated |
| **Statement of Operations:** | | | |
| Net revenues: | | | |
| Rentals | $ 17,238 | $ (750) | $ 16,488 |
| Net revenues | 19,044 | (750) | 18,294 |
| Gross profit | 13,307 | (750) | 12,557 |
| Operating income | 1,164 | (750) | 414 |
| Income (loss) before income taxes | 879 | (750) | 129 |
| Income tax (expense) benefit | (384) | 296 | (88) |
| Net income (loss) | 495 | (454) | 41 |
| Net income (loss) per share: | | | |
| Basic | $ 0.02 | $ (0.02) | $ — |
| Diluted | $ 0.02 | $ (0.02) | $ — |

| | [Consolidated balance sheet at] March 31, 2016 | | |
|---|---|---|---|
| | As Previously Reported | Adjustment | As Restated |
| **Balance Sheet:** | | | |
| Accounts receivable, net | $ 15,359 | $ (2,334) | $ 13,025 |
| Total Current Assets | 22,380 | (2,334) | 20,046 |
| Deferred income taxes | 11,158 | 922 | 12,080 |
| Total Assets | 100,164 | (1,412) | 98,752 |
| Retained deficit | (39,467) | (1,412) | (40,879) |
| Total Stockholders' Equity | 52,078 | (1,412) | 50,666 |
| Total Liabilities and Stockholders' Equity | $100,164 | $ (1,412) | $ 98,752 |

77. Further, the Q1 2016 10-Q was materially false and misleading because, directly contrary to the certifications of Defendants Steen and Foster, Defendants knew or were reckless in not knowing that Defendants, as they admitted in the 2015 10-K/A:

> did not maintain an effective control environment to allow for the accurate review and filing of our financial statements primarily attributable to the following factors:
>
> - We did not have adequate processes or policies in place to enable members of our management team to timely review the detailed calculation of accounts receivable collections and contractual allowance reserves;
>
> - We did not have controls designed to validate the completeness and accuracy of underlying data used in the contractual allowance account reconciliation and in the determination of this significant estimate and, as a result, material errors were later identified in the underlying calculation used to support this significant estimates; and
>
> - We did not have an adequate process or appropriate controls in place to support the accurate reporting of our financial results and disclosures on our Form 10-K.
>
> One or more of the foregoing control deficiencies contributed to the restatement of our consolidated financial statements for the fiscal year ended December 31, 2015 and for each of

> the quarterly periods from March 31, 2015 to June 30, 2016. Additionally, the foregoing control deficiencies could result in material misstatements of these consolidated financial statements that would not be prevented or detected. Accordingly, management has determined that these control deficiencies resulted in the material weakness, as set forth above. Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

78. On August 10, 2016, the Company filed a Form 10-Q for the quarter ended June 30, 2016 (the "Q2 2016 10-Q") with the SEC, which provided the Company's second quarter 2016 financial results and position and stated that the Company's internal control over financial reporting was effective as of June 30, 2016. The Q2 2016 10-Q was signed by Defendants Steen and Foster. The Q2 2016 10-Q contained signed SOX certifications by Defendants Steen and Foster, substantially identical to those in the Q1 2015 10-Q, reproduced in their entirety above in ¶¶ 60 and 61 and incorporated herein, attesting to the accuracy of the financial statements, effectiveness of internal controls, and that all fraud was disclosed.

79. The Q2 2016 10-Q was materially false and misleading because Defendants knew or recklessly disregarded that the Company had materially misstated its financial statements for the second quarter of 2016, as the Company later admitted when it restated its financial statements, overstating revenues and pre-tax income by

approximately $943,000, bringing the aggregate of overstated revenues and pre-tax income to approximately $3,277,000. The effects of this overstatement were shown in the amendment to the Company's quarterly reports on Form 10-Q/A for the fiscal quarter ended June 30, 2016 (the "Q2 2016 10-Q/A" and, collectively with the Q1 2016 10-Q/A and 2015 10-K/A, the "Amendments") that InfuSystem later filed on December 12, 2016 as follows:

| June 30, 2016 | | | |
|---|---|---|---|
| **Statement of Operations:** | **As Previously Reported** | **Adjust** | **As Restated** |
| Net revenues: | | | |
| Rentals | $ 17,185 | $ (943) | $ 16,242 |
| Net revenues | 19,066 | (943) | 18,123 |
| Gross profit | 12,086 | (943) | 11,143 |
| Operating income | 1,381 | (943) | 438 |
| Income (loss) before income taxes | 1,061 | (943) | 118 |
| Income tax (expense) benefit | (337) | 372 | 35 |
| Net income (loss) | 724 | (571) | 153 |
| Net income (loss) per share: | | | |
| Basic | $ 0.03 | $ (0.02) | $ 0.01 |
| Diluted | $ 0.03 | $ (0.02) | $ 0.01 |

| [Consolidated balance sheet at] June 30, 2016 | | | |
|---|---|---|---|
| **Balance Sheet:** | **As Previously Reported** | **Adjust** | **As Restated** |
| Accounts receivable, net | $ 16,953 | $ (3,278) | $ 13,675 |
| Total Current Assets | 23,804 | (3,278) | 20,526 |
| Deferred income taxes | 10,821 | 1,295 | 12,116 |
| Total Assets | 100,267 | (1,983) | 98,284 |
| Retained deficit | (38,743) | (1,983) | (40,726) |
| Total Stockholders' Equity | 52,940 | (1,983) | 50,957 |
| Total Liabilities and Stockholders' Equity | $ 100,267 | $ (1,983) | $ 98,284 |

80. Further, the Q2 2016 10-Q was materially false and misleading because, directly contrary to the certifications of Defendants Steen and Foster, Defendants knew or were reckless in not knowing that Defendants, as they admitted in the 2015 10-K/A:

> did not maintain an effective control environment to allow for the accurate review and filing of our financial statements primarily attributable to the following factors:
>
> • We did not have adequate processes or policies in place to enable members of our management team to timely review the detailed calculation of accounts receivable collections and contractual allowance reserves;
>
> • We did not have controls designed to validate the completeness and accuracy of underlying data used in the contractual allowance account reconciliation and in the determination of this significant estimate and, as a result, material errors were later identified in the underlying calculation used to support this significant estimates; and
>
> • We did not have an adequate process or appropriate controls in place to support the accurate reporting of our financial results and disclosures on our Form 10-K.
>
> One or more of the foregoing control deficiencies contributed to the restatement of our consolidated financial statements for the fiscal year ended December 31, 2015 and for each of the quarterly periods from March 31, 2015 to June 30, 2016. Additionally, the foregoing control deficiencies could result in material misstatements of these consolidated financial statements that would not be prevented or detected. Accordingly, management has determined that these control deficiencies resulted in the material weakness, as set forth above. Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

**The Truth Emerges**

81. The November 7 8-K stated that InfuSystem's previously issued financial statements for all four quarters of 2015, and for the first two quarters of 2016, should not be relied upon, stating in relevant part:

> **Item 4.02. Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review.**
>
> (a) On November 1, 2016, the Audit Committee of the Board of Directors of InfuSystem Holdings, Inc. (the "Company") concluded, after review and discussion with management and the Company's independent registered public accounting firm, BDO USA, LLP ("BDO"), that ***the Company's audited financial statements for the fiscal year ended December 31, 2015, and the Company's unaudited financial statements for each of the fiscal quarters ended March 31, 2015 through June 30, 2016 (collectively, the "Financial Statements") should no longer be relied upon. The Financial Statements contained an error related to an overstatement of estimated accounts receivable collections which in turn overstated revenues and pre-tax income by a corresponding amount.***
>
> As of the date of this filing, the Audit Committee's internal review of this matter is not complete. ***Nevertheless, the Audit Committee believes that material adjustments to the Financial Statements are required and that the Company will need to restate the Financial Statements.***
>
> Due to the nature of the industry and the reimbursement environment in which the Company operates, certain estimates are required to record net revenues and accounts receivable at their net realizable value. The Company reports accounts receivable at the estimated net realizable amounts from patients, third-party payors and other direct pay

customers for goods provided and services rendered. The Company records an allowance for doubtful accounts and contractual allowance (to reduce gross billed charges to a contractual or estimated net realizable value from third-party payors) based on the estimated collectability of the accounts such that the recorded amounts reflect estimated net realizable value. Upon determination that an account is uncollectible, the account is written-off and charged to the contractual allowance or the allowance for doubtful accounts, depending upon whether the account relates to a third-party payor or a patient. The Company's contractual allowance is a reduction to accounts receivable, similar in nature to the allowance for doubtful accounts. However, additions to the contractual allowance each period offset the gross billed charges, which are not publicly reported in the Company's filings, to arrive at net revenue, which is publicly reported in the Company's income statement. The additions to allowance for doubtful accounts, however, impact the bad debt expense line item of the income statement. Accounts receivable, net, is currently reported in the Company's consolidated Financial Statements, as accounts receivable less allowance for bad debt and contractual allowances. The Company's estimate for its contractual allowance is based upon management's assessment of historical and expected net collections. The Company discovered that it has been applying an incorrect cash collection percentage due to an error when calculating the historical collection percentage from certain billings to third-parties. This calculation error resulted in an overstatement of historical cash collection percentages from this revenue, which was then used to estimate future cash collections relative to an outstanding accounts receivable balance. The error affects only the Company's rentals of infusion pumps to patients, which are paid for by third-party insurance payors. Revenue resulting from sales, service and rentals directly billed to health care providers is not impacted by this error.

At this time, the Company estimates that the impact on the Financial Statements would be to increase the provision for

contractual allowance (thereby reducing accounts receivable as shown on the balance sheet) by an aggregate cumulative amount of approximately $3.3 million with a corresponding decrease in revenue and pre-tax income of the same amount, spread over the periods covered by the Financial Statements. The following table provides a quarterly breakdown of the estimated impact of this error on our revenues and pre-tax income for each quarter, in which the impact has generally increased monthly due to the error affecting a larger percentage of the calculation's historical measurement period:

| | Three Months Ended | | | | | |
|---|---|---|---|---|---|---|
| ***(in thousands)*** | **Mar. 31 2015** | **June 30 2015** | **Sep. 30 2015** | **Dec. 31 2015** | **Mar. 31 2016** | **June 30 2016** |
| Unaudited Estimated Impact | $ 173 | $ 234 | $ 380 | $ 795 | $ 751 | $ 943 |

The Company is working with its Audit Committee and the Company's independent auditor to determine the full impact of these potential adjustments on the Financial Statements. However, until the review is complete and a final determination is made, the Company cannot provide assurance regarding the complete impact of any adjustments on the Financial Statements for the affected periods, and the Company cannot provide assurance that the adjustments identified above are representative of the adjustments that will be required when the review is complete. Furthermore, the Company cannot provide assurance that the review will not identify further adjustments that may be required.

In connection with the Audit Committee's internal review, the Company is evaluating its internal control over financial reporting to determine if any significant deficiencies or material weaknesses in such controls caused or contributed to any potential adjustments that may be required.

> The Audit Committee has discussed the matters disclosed in this Item 4.02 with BDO.
>
> The Audit Committee plans to complete its internal review and file its Quarterly Report on Form 10-Q for the fiscal quarter and nine months ended September 30, 2016 ("2016 Q3 Form 10-Q") and the restated Financial Statements as promptly as possible. Although the Company will seek to extend the time required to file its 2016 Q3 Form 10-Q in accordance with Rule 12b-25 under the Securities Exchange Act of 1934, as amended, there can be no assurance that the Company will be able to file such report within the time period prescribed by Rule 12b-25.
>
> (Emphasis added).

82. On this news, the Company's shares fell $1.00 per share, or over 38.46%, from a November 6, 2016 close of $2.60 to November 7, 2016 close of $1.60 per share on unusually heavy trading volume.

83. On December 12, 2016, InfuSystem restated its financial statements in the 2015 10-K/A and an amendment to the Company's quarterly reports on Form 10-Q/A for the fiscal quarters ended March 31, 2016 and June 30, 2016 (the "Q1 2016 10-Q/A" and "Q2 2016 10-Q/A, respectively, and, collectively with the 2015 10-K/A, the "Amendments"). In a press release filed on Form 8-K in connection with the filing of the Amendments and the Company's third quarter 2016 financial results, Steen stated: "We are confident that we have taken the necessary steps to correct and implement the appropriate internal controls to strengthen our financial reporting."

84. The 2015 10-K/A restated the Company's consolidated financial statements as of and for the fiscal year ended December 31, 2015 and amended the related disclosures thereto, including regarding internal controls and procedures. The impact of the restatement for the fiscal year ended December 31, 2015 was to increase the provision for contractual allowance (thereby reducing accounts receivable as shown on the balance sheet) and other items by an aggregate cumulative amount of approximately $1.584 million, consisting of $173,000 for the quarter ended March 31, 2015, $234,000 for the quarter ended June 30, 2015, $381,000 for the quarter ended September 30, 2015, and $796,000 for the quarter ended December 31, 2015.

85. The 2015 10-K/A falsely described the Company's process for writing off bad debt, maintaining again that "The Company performs periodic analyses to assess the accounts receivable balances. The Company records an allowance for doubtful accounts and contractual allowance (to reduce gross billed charges to a contractual or estimated net realizable value from third party payors) based on management's assessment of historical and expected estimated collectability of the accounts such that the recorded amounts reflect estimated net realizable value. Upon determination that an account is uncollectible, the account is written off and charged to the allowance for doubtful accounts for patients or the contractual allowance for third party payors. The Company's allowance for doubtful accounts and contractual allowance are a reduction to accounts receivable on the Company's consolidated financial position." InfuSystem

made this statement even as it admitted that "a calculation error when calculating the historical collection percentage from certain billings to third parties… resulted in an overstatement of historical cash collection percentages from this revenue, which was then used to estimate future cash collections relative to an outstanding accounts receivable balance."

86. The Company failed to disclose that its overstatement of accounts receivable was not based on inadvertent calculation errors, but on systemic, years-old deficiencies in its accounts receivable procedures and processes.

87. The 2015 10-K/A further stated that "Revenue resulting from sales, service and rentals directly billed to health care providers is not impacted by this calculation error." As the statements and emails provided by FE1 make clear, however, InfuSystem's entire accounts receivables processes and procedures, which the Company reported in its balance sheets as a single line item without delineating third party from direct payors, were deeply flawed and consistently overstated due to the Company's failure to write off uncollectible debt and keep accurate records of its collections.

88. The Q1 2016 10-Q/A restating the Company's financial statements for the three months ended March 31, 2016, increased the provision for contractual allowance (thereby reducing accounts receivable as shown on the balance sheet) by an additional $750,000. The Q2 2016 10-Q/A restating the Company's financial statements for the

three months ended June 30, 2016, increased the provision for contractual allowance (thereby reducing accounts receivable as shown on the balance sheet) by an additional $943,000. Thus, cumulatively, from the first quarter of 2015 through the second quarter of 2016, the Company misreported its financial statements by approximately $3.28 million.

89. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Lead Plaintiff and other Class members have suffered significant losses and damages.

**Defendants' GAAP Violations**

90. As described in FE1's account of his experience at the Company, InfuSystem failed to maintain books and records in sufficient detail to reflect the transactions of the Company and prepare financial statements in accordance with GAAP.[2] Section 13(b) 2 of the Exchange Act entitled *Periodical and Other Reports* states the following with respect to books and records and internal controls:

[2] GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. § 210.10-01(a).

> Every issuer which has a class of securities registered pursuant to section 12 and every issuer which is required to file reports pursuant to section 15(d) shall:
>
> A. Make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer;
>
> B. devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –
>
> i. transactions are executed in accordance with management's general or specific authorization;
>
> ii. transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (II) to maintain accountability for assets;
>
> iii. access to assets is permitted only in accordance with management's general or specific authorization; and
>
> iv. the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

91. A strong system of internal controls helps management achieve its objectives related to the effectiveness and efficiency of its operations, the reliability of its financial reporting, and compliance with applicable laws and regulations. It is management's responsibility to develop and implement internal controls necessary to ensure that it maintains adequate books and records. This is made clear in SEC regulations and in a report prepared by the Committee of Sponsoring Organizations of

the Treadway Commission ("COSO"), Internal Control – Integrated Framework (the "COSO Report").[3]

92. The COSO Report defines internal control as a process that is "designed to provide reasonable assurance regarding the achievement of objectives" related to the effectiveness and efficiency of operations, the reliability of financial reporting, and compliance with applicable laws and regulations. More broadly, however, a system of internal control encompasses more than the policies governing the objectives related to operations, financial reporting, and compliance; namely, it includes the actions taken by a company's board of directors, management at all levels, and employees in running the business.

93. The COSO Report requires that financial statements prepared for external purposes be fairly presented in conformity with GAAP and regulatory requirements. Borrowing from generally accepted auditing standards, the COSO Report defines fair presentation as the following:

---

[3] Generally accepted auditing standards codified in AU §319, Consideration of Internal Control in a Financial Statement Audit, is based on the internal control framework described in the COSO Report. The COSO report was issued in September 1992 as a four-volume set. Additional modifications and updates of the framework have been issued with the most recent Integrated Framework being issued in 2013 as a three-volume set.

> - the accounting principles selected and applied have general acceptance;
>
> - the accounting principles are appropriate in the circumstances;
>
> - the financial statements are informative of matters that may affect their use, understanding and interpretation; and
>
> - the financial statements reflect the underlying transactions and events in a manner that presents the financial position, results of operations and cash flows stated within a range of acceptable limits, that is, limits that are reasonable and practical to attain in financial statements.[4]

94. The COSO Report describes internal control within a certain framework that consists of five separate components. It requires that financial statements prepared for external use are fairly presented in conformity with generally accepted accounting principles and regulatory requirements. The COSO Report defines five components of an internal control framework that are needed to enable a business to achieve its objectives: (1) the control environment, (2) risk assessment, (3) control activities, (4) information and communications and (5) monitoring.

95. Everyone in an organization has responsibility for good internal control. The CEO, however, sets the "tone at the top" that affects integrity, ethics, and other factors of a positive control environment. "In any organization, 'the buck stops' with

[4] *See* COSO Report, Chapter 3; see also Statement on Auditing Standards No. 69, The Meaning of "Present Fairly in Conformity With Generally Accepted Accounting Principles" in the Independent Auditor's Report (New York: AICPA, 1992).

the chief executive. He or she has ultimate ownership responsibility for the internal control system. The influence of the CEO on an entire organization cannot be overstated."[5] The chief executive fulfills this duty by providing leadership and direction to senior managers and reviewing the way they are controlling the business. The Addendum to the COSO Report makes it clear that the Chief Accounting Officer – at InfuSystem, Defendant Foster, who signed the Company's financial disclosures as the Principal Accounting and Financial Officer – plays a critical role with respect to the internal control system.

96. InfuSystem's CEO, Defendant Steen, and the CFO, Defendant Foster, failed to comply with SEC regulations and the requirements of COSO. As described herein, there were material weaknesses in internal control at InfuSystem that were necessary to prepare accurate financial statements and ensure compliance with regulatory filing requirements applicable to public companies. A material weakness is defined by the SEC as "a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the registrant's annual or interim financial statements will not be prevented or detected on a timely basis." Both the Company's own admission in its

---

[5] COSO Report, Chapter 8, p. 84.

Form 10-K/A[6] and the state of affairs described in detail by FE1, InfuSystem's former credit and collections manager who was tasked with improving its internal controls, make clear that InfuSystem's internal controls were ineffective and materially deficient. InfuSystem's internal control system failed to live up to the standards as set forth in the five elements of an internal control framework described above, and Defendants Steen and Foster thus failed to maintain a proper tone and control awareness that focused on achieving consistent application of accounting policies and procedures and strict adherence to GAAP. The existence of these material weaknesses enabled the Defendants to circumvent the Company's accounting policies, causing a misstatement of InfuSystem's revenues and pre-tax income throughout the Class Period.

97. Knowing all this, the Individual Defendants falsely signed false SOX certifications in each of the Company's financial statements during the Class Period, fraudulently attesting to the effectiveness of the Company's international controls.

---

[6] The Public Company Accounting Oversight Board's ("PCAOB") definition is identical, except is replaces the word "registrant's" with "company's" and notes that "There is a reasonable possibility of an event, as used in this standard, when the likelihood of the event is either 'reasonably possible' or 'probable,' as those terms are used in Financial Accounting Standards Board Statement No. 5, Accounting for Contingencies ('FAS 5')." AS 5 ¶A7.

**PLAINTIFFS' CLASS ACTION ALLEGATIONS**

98. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired InfuSystem securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

99. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, InfuSystem securities were actively traded on the NYSE. While the exact number of Class members is unknown to Lead Plaintiff at this time and can be ascertained only through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by InfuSystem or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

100. Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

101. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Lead Plaintiff has no interests antagonistic to or in conflict with those of the Class.

102. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of InfuSystem;
- whether the Individual Defendants caused InfuSystem to issue false and misleading financial statements during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;
- whether the prices of InfuSystem securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

103. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action

**APPLICABILITY OF PRESUMPTION OF RELIANCE**
**(FRAUD-ON-THE-MARKET DOCTRINE)**

104. The market for InfuSystem securities was open, well-developed, and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose described herein, InfuSystem securities traded at artificially inflated prices during the Class Period. Lead Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities, relying upon the integrity of the market price of InfuSystem securities and the market information relating to InfuSystem, and have been damaged thereby.

105. During the Class Period, the artificial inflation of InfuSystem stock was caused by the material misrepresentations and/or omissions particularized in this Amended Complaint, causing the damages sustained by Lead Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made

or caused to be made a series of materially false and/or misleading statements about InfuSystem's business, operations, and revenues. These material misstatements and/or omissions created an unrealistically positive assessment of InfuSystem and its business and financial condition, causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company stock. Defendants' materially false and/or misleading statements during the Class Period resulted in Lead Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

106. At all relevant times, the market for InfuSystem securities was an efficient market for the following reasons, among others:

a. InfuSystem stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

b. As a regulated issuer, InfuSystem filed periodic public reports with the SEC and/on the NYSE;

c. InfuSystem regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

d. InfuSystem was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

As a result of the foregoing, the market for InfuSystem securities promptly digested current information regarding InfuSystem from all publicly available sources and reflected such information in InfuSystem's stock price. Under these circumstances, all purchasers of InfuSystem securities during the Class Period suffered similar injury through their purchase of InfuSystem securities at artificially inflated prices, and a presumption of reliance applies.

## NO SAFE HARBOR

107. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

## COUNT I

**Violations of Section 10(b) of The Exchange Act and Rule 10b-5**
**Against All Defendants**

108. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

109. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

110. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of InfuSystem securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire InfuSystem securities at artificially inflated

prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

111. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for InfuSystem securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about InfuSystem's finances and business prospects.

112. By virtue of their positions at InfuSystem, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

113. Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of InfuSystem securities from their personal portfolios.

114. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of InfuSystem, the Individual Defendants had knowledge of the details of InfuSystem's internal affairs.

115. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of InfuSystem. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to InfuSystem's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of InfuSystem securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning InfuSystem's business and financial condition which were concealed by Defendants, Lead Plaintiff and the other members of the Class purchased or otherwise acquired InfuSystem securities at artificially inflated prices and relied upon the price of the securities, the integrity of the

market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

116. During the Class Period, InfuSystem securities were traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of InfuSystem securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of InfuSystem securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of InfuSystem securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

117. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

118. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their

respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**Violations of Section 20(a) of The Exchange Act**
**Against The Individual Defendants**

119. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

120. During the Class Period, the Individual Defendants participated in the operation and management of InfuSystem, and conducted and participated, directly and indirectly, in the conduct of InfuSystem's business affairs. Because of their senior positions, they knew the adverse non-public information about InfuSystem's current financial position and future business prospects.

121. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to InfuSystem's business practices, and to correct promptly any public statements issued by InfuSystem which had become materially false or misleading.

122. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which InfuSystem disseminated in the marketplace

during the Class Period concerning the Company's business, operational and accounting policies. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause InfuSystem to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of InfuSystem within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of InfuSystem securities.

123. Each of the Individual Defendants, therefore, acted as a controlling person of InfuSystem. By reason of their senior management positions and/or being directors of InfuSystem, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, InfuSystem to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of InfuSystem and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

124. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by InfuSystem.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representative;

B. Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as her reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

**DEMAND FOR TRIAL BY JURY**

Plaintiffs hereby demand a trial by jury.

Dated: April 18, 2017

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

/s/ *Laurence Rosen*

Laurence M. Rosen, Esq. (SBN 219683)
355 S. Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

and

Jacob A. Goldberg
101 Greenwood Avenue, Suite 440
Jenkintown, PA 19046
Telephone: (215) 600-2817
Facsimile: (212) 202-3827
Email: jgoldberg@rosenlegal.com

***Lead Counsel for Plaintiff and the Class***

## **CERTIFICATE OF SERVICE**

I hereby certify that on April 18, 2017, I electronically filed the foregoing ***Amended Class Action Complaint for Violation of the Federal Securities Laws*** with the Clerk of Court using the CM/ECF system, which will send notification of such to all CM/ECF participants.

**THE ROSEN LAW FIRM, P.A.**

By: /s/ *Jacob A. Goldberg*
Jacob A. Goldberg
101 Greenwood Avenue, Suite 440
Jenkintown, PA 19046
Telephone: (215) 600-2817
Facsimile: (212) 202-3827
E-M: jgoldberg@rosenlegal.com

***Lead Counsel for Plaintiffs and the Class***