O

# United States District Court
# Central District of California

JOHN LECHNER, Individually and on behalf of all others similarly situated,

Plaintiff,

v.

INFUSYSTEM HOLDINGS, INC., ERIC K. STEEN, and JONATHAN P. FOSTER,

Defendants.

Case № 2:16-cv-08295-ODW(AGRx)

**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS WITH LEAVE TO AMEND [33]**

## I. INTRODUCTION

This is a putative class action for securities fraud under sections 10(b) and 20(a) of the Securities Exchange Act of 1934. On November 8, 2016, Plaintiff John Lechner filed his Complaint against InfuSystem Holdings, Inc., Eric K. Steen, and Jonathan P. Foster (collectively, "Defendants"). (ECF No. 1.) Lechner then amended his Complaint on April 18, 2017. (ECF No. 28.) On June 19, 2017, Defendants moved to dismiss the First Amended Complaint ("FAC"), and Lechner opposed. (Mot., ECF No. 33; Opp'n, ECF No. 37; Reply, ECF No. 38.) For the reasons below,

the Court **GRANTS** Defendants' Motion, with leave to amend.[1]

## II. REQUEST FOR JUDICIAL NOTICE

InfuSystem requests that the Court take judicial notice of twenty-five exhibits. (Request for Judicial Notice ("RJN"), ECF No. 34.) Generally, when ruling on a Rule 12(b)(6) motion to dismiss, a district court may not consider evidence outside of the pleadings. *See United States v. Ritchie*, 342 F.3d 903, 907–08 (9th Cir. 2003). "Even if a document is not attached to a complaint, it may be incorporated by reference into a complaint if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claims." *Id.* at 908. Then, "the defendant may offer such a document, and the district court may treat such document as part of the complaint, and thus may assume that its contents are true for purposes of a motion to dismiss under Rule 12(b)(6)." *Id.*; *see also In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1159 (C.D. Cal. 2007).

**Exhibits 1 through 10** include InfuSystem's quarterly and annual filings with the Securities Exchange Commission ("SEC"), during the alleged class period, and Forms 8-K, 10-K/A,[2] and 10-Q/A's filed with the SEC in November and December 2016. (*See* RJN Exs. 1–10.) Lechner expressly refers to, and relies on, these documents in the FAC, and thus they are properly incorporated by reference. (FAC ¶¶ 7–9, 59–80, 85–87); *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1160 (9th Cir. 2012).

**Exhibit 11** is a transcript of InfuSystem's December 12, 2016, earnings report conference call with securities analysts. (RJN Ex. 11.) On the call, InfuSystem's executives, including Steen, discuss a purported error on an Excel spreadsheet, among other things, that resulted in misstated earnings. (*Id.*) Lechner does not specifically refer to this conference call in the FAC, but describes the basis for his claim as

---

[1] After considering the papers filed in connection with the Motion, the Court deemed the matter appropriate for decision without oral argument. Fed. R. Civ. P. 78(b); C.D. Cal. L.R. 7-15.

[2] A "10-K/A" form amends a previously filed 10-K form.

coming from "a review of Defendants' public documents, conference calls and announcements made by Defendants…."[3] (FAC ¶¶ 7–9.) Lechner disputes the truth of the statements in the transcript, and thus the Court takes judicial notice of the fact that InfuSystem and/or its executives made them, but not their truth. *See McCasland v. FormFactor Inc.*, No. C 07–5545 SI, 2008 WL 2951275, at *12 (N.D. Cal. July 25, 2008).

**<u>Exhibits 12 through 14 and 16 through 25</u>** are InfuSystem's Proxy Statements filed with the SEC between 2015 and 2017, and Steen and Foster's filed SEC Form 4's. (RJN Exs. 12–14, 16–25.) The Court takes judicial notice of these documents as well. *See In re Am. Apparel, Inc. Sec. Litig.*, 855 F. Supp. 2d 1043, 1060–62 (C.D. Cal. 2012) (taking judicial notice of proxy statements); *City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1059 (N.D. Cal. 2012) (taking judicial notice of the truth and contents of Form 4 where plaintiff's allegations of scienter relied on stock sales). Here, Lechner specifically alleges that "Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of InfuSystem securities from their personal portfolios." (FAC ¶ 113.) Lechner does not dispute the authenticity of the Forms 4. Accordingly, the Court takes notice of the contents of the Forms 4. *City of Royal Oak Ret. Sys.*, 880 F. Supp. 2d at 1059.

**<u>Exhibit 15</u>** provides InfuSystem's historic stock price during the class period. (RJN Ex. 15.) Historic stock prices are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." *Schechter v. Smith*, No. EDCV-09-1653 MJG, 2011 WL 13174954, at *7 (C.D. Cal. Dec. 6, 2011) (citations omitted). Accordingly, the Court takes judicial notice of Exhibit 15.

## III. FACTUAL BACKGROUND

InfuSystem is a healthcare company that sells and rents infusion pumps used in

[3] The Court takes this quote from the first, unnumbered paragraph of the FAC.

treating cancer, as well as related products and services. (FAC ¶ 3.) Steen was InfuSystem's President and CEO during the alleged class period, and signed all of InfuSystem's SEC filings. (*Id.* ¶ 19.) Foster was InfuSystem's CFO during the same period, and signed similar SEC filings.[4] (*Id.* ¶ 20.) In August 2016, Foster resigned, and Christopher Downs replaced him, as the Interim CFO. (*Id.*)

InfuSystem generates revenue from selling, renting, and servicing infusion pumps. (RJN Ex. 4.) It collects revenues from third-party payors, such as insurance companies, and direct-pay customers. (FAC ¶ 3.) InfuSystem measures its net revenues and accounts receivable by calculating their "net realizable value," which is meant to represent the management's expected rate of collection, based on historical collection data, among other things. (*See* RJN Ex. 4.) For third-party payors, InfuSystem calculates and provides an "allowance for doubtful accounts." (*Id.*) It also calculates a "contractual allowance" for its third-party payor business. (*Id.*)

Lechner's securities fraud claims focus on InfuSystem's accounting practices—specifically, its accounts receivable. (*Id.* ¶¶ 59–80.) These practices, Lechner alleges, resulted in overstated revenues and gross income on SEC filings, over six quarters spanning all of 2015 and the first two quarters of 2016. (*Id.*) InfuSystem ultimately had to restate its financials, and file appropriate forms with the SEC, but attributed the incorrect financial statements to an error in an Excel spreadsheet. (*Id.* ¶¶ 81–97.) While the FAC does not attack one specific portion of the accounts receivable calculations as faulty, InfuSystem's restated financial reports attribute the overstatement to InfuSystem's infusion-pump rental business, paid for by third parties, not its direct-pay business. (RJN Exs. 7–10.)

*1. InfuSystem's Restatement of Financials*

On November 7, 2016, InfuSystem reported in its 8-K that it "discovered that it [had] been applying an incorrect cash collection percentage due to an error when calculating the historical collection percentage from certain billings to third-parties."

[4] The Court refers to Steen and Foster as the "Individual Defendants."

(FAC ¶¶ 4–6; RJN Ex. 7.) InfuSystem estimated the overstatement to be approximately $3.3 million over fiscal year 2015, and the first two quarters of 2016, combined. (*Id.*) InfuSystem informed investors that it would be restating its financials for the effected periods, and conduct an investigation. (*Id.*) On the same day, the company's stock dropped by approximately 40%. (FAC ¶¶ 5, 82.)

On December 12, 2016, InfuSystem filed amended financial statements for the impacted years. (FAC ¶¶ 83–84.) In these statements, the company again explained that the calculation error affected only the rental pump business, paid for by third-party payors, and that the error did not impact revenues from the direct sales business. (RJN Ex. 8.) InfuSystem also explained that it had found material weaknesses in its internal controls over financial reporting, and that it was implementing a plan to simplify its calculation of accounts receivable. (*Id.*; FAC ¶ 83.) On this revelation to the market, the stock price rose from $1.95 per share at the close of the previous trading day to $2.15, and rose again the following day to $2.35 per share. (RJN Ex. 15.)

*2. Plaintiff's Allegations of Fraud & Former Employee 1*

Relying largely on a confidential witness, Lechner claims that the reason for the misstated revenues was not a calculation error, but "systemic, years-old deficiencies in [InfuSystem's] accounts receivable procedures and processes." (FAC ¶ 86.)

In November 2015, Former Employee 1 ("FE1") started working as a "credit and collections manager" in InfuSystem's Kansas office, working with direct pay customers. (*Id.* ¶ 30 n.1.) He resigned approximately three months later, in January 2016. (*Id.* ¶ 56.) Despite his short tenure, FE1 "recalled that Defendants Steen and Foster were aware of the material weaknesses in the Company's internal controls well before his hiring." (FAC ¶ 34.) Specifically, FE1 recalled that:

- InfuSystem hired him to resolve weaknesses in InfuSystem's accounts receivable practices[5] (FAC ¶¶ 30–34);
- InfuSystem had an abnormal amount of receivables that were past 120-days overdue, but had not been written off, in contravention of Generally Accepted Accounting Principles ("GAAP") (FAC ¶¶ 34–38, 42–47, 90–97);
- The Individual Defendants, and FE1's direct supervisor, Alison Ysusi, acknowledged the inadequacy of InfuSystem's accounts receivables practices (FAC ¶¶ 39–41, 48–49, 51–53);
- On one occasion, FE1's supervisor told him that InfuSystem's practice was not to write-off bad debt unless Foster instructed her to do so, remarking "we put in here whatever the CFO tells us to put in here," and "sometimes it's this, and sometimes it's that" (FAC ¶ 40); and
- InfuSystem did not perform due diligence on its customers, and continued to bill them despite accounts receivable in arrears for up to eight years. (FAC ¶¶ 45, 50–51).

In March 2016, after resigning, FE1 emailed InfuSystem's human resources department and explained that he had contacted the Department of Labor and SEC in light of InfuSystem's allegedly fraudulent actions. (*Id.* ¶¶ 57–58.) In his correspondence to InfuSystem, FE1 forwarded his email exchange with the whistleblower investigator for the Department of Labor, and explained:

> I was told that I have two options; [sic] file a whistleblower lawsuit and/or report my information and documentation around [Sarbanes-Oxley] violations to the SEC in writing…. This is not something that I want to do. I would prefer to work together around InfuSystem providing employment

[5] Lechner argues that FE1 was given a "mandate to devise processes to fix the A/R system throughout the entire company." (Opp'n 4.) This is despite his admission that FE1 was hired in "[t]he Kansas office, [which] handled receivables for the Company's direct pay customers." (FAC ¶ 30 n.1.) The FAC alleges only that the Individual Defendants provided him a memorandum addressing his duties, which included "monitor[ing] third-party collection activity," without any further explanation. (FAC ¶ 31.)

> verifications within the standards that Janet explained during my exist [sic] interview.

(*Id.* ¶ 58.) On November 8, 2016, a day after InfuSystem stated in its 8-K that it needed to restate its revenues, Lechner filed his Complaint. (ECF No. 1.)

## IV. LEGAL STANDARD

A court may dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) for lack of a cognizable legal theory or insufficient facts pleaded to support an otherwise cognizable legal theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). In a private securities fraud case, the plaintiff must comply with the stringent pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012), although the Rule 9(b) analysis is "effectively subsumed" under the stricter PSLRA analysis. *Miss. Pub. Emps. Ret. Sys. v. Boston Sci. Corp.*, 523 F.3d 75, 85 n.5 (1st Cir. 2008).

"In a typical § 10(b) private action a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc.*, 552 U.S. 148, 157 (2008); *see also* 17 C.F.R. § 240.10b-5. "[T]he complaint must allege that the defendants made false or misleading statements either intentionally or with deliberate recklessness." *In re Daou Sys., Inc.*, 411 F.3d 1006, 1015 (9th Cir. 2005) (citing *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 974 (9th Cir. 1999)).

In alleging scienter, "mere recklessness or a motive to commit fraud and opportunity to do so" is not enough. *Reese v. Malone*, 747 F.3d 557, 569 (9th Cir. 2014), *overruled on other grounds by City of Dearborn Heights Act 345 Police & Fire Ret. Sys v. Align Tech., Inc.*, 856 F.3d 605, 616 (9th Cir. 2017). "Rather, the plaintiff must plead 'a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care,

and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'" *Zucco*, 552 F.3d at 991 (quoting *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1569 (9th Cir. 1990)).

## V. DISCUSSION

### A. Former Employee 1

Much of Lechner's FAC relies on statements attributed to a confidential witness, FE1. To satisfy the PSLRA, a complaint relying on a confidential witness must: 1) "provide[] sufficient detail about a confidential witness' position within the defendant company to provide a basis for attributing the facts reported by that witness to the witness' personal knowledge;" and 2) must establish that "those statements which are reported by confidential witnesses…[are] themselves indicative of scienter." *Zucco*, 552 F.3d at 995 (citing *In re Daou*, 411 F.3d at 1006).

Lechner describes FE1's position at InfuSystem as the "credit and collections manager" from "early November 2015 until late January 2016." (FAC ¶ 30 n.1.) FE1 worked out of the Kansas office, handled receivables for InfuSystem's direct pay customers, and reported to InfuSystem's accounting manager, Alison Ysusi. (*Id.*) FE1 "worked directly with Steen, Foster, and Smith in attempting to develop an effective accounts receivable process." (*Id.*) FE1 alleges that "Steen and Foster hired FE1 specifically to resolve material weaknesses in the Company's accounting for accounts receivable and allowance for doubtful accounts, weaknesses of which both were aware." (*Id.* ¶ 34.)

The purpose of the first prong of the *Zucco* analysis is to provide assurances that the confidential witness was in a position within the company, such that the witness would have personal knowledge of the facts alleged. *Zucco*, 552 F.3d at 995 (citing *In re Daou*, 411 F.3d at 1015). Most troubling to the Court is the fact that FE1 only worked at InfuSystems for a period of less than three months, and left the company approximately nine months before the November 7, 2016 announcement,

which Lechner claims affected InfuSystem's stock price. (FAC ¶¶ 30, 81–82.) Moreover, the SEC quarterly and annual reports, which contained misstated financial data, are dated May 12, 2015, August 3, 2015, November 12, 2015, March 9, 2016, May 10, 2016, and August 10, 2016. (RJN Exs. 1–6.) Thus, only one of those reports could have been filed during the period FE1 was employed, and only to the extent that November 12, 2015, qualifies as "early November 2015." (*See* FAC ¶ 30 n.1.)

Any information regarding InfuSystem's allegedly faulty accounts receivable practices that pre- or post-dated FE1's three-month employment constitutes second-hand knowledge, largely consisting of hearsay statements. Information of this sort does not meet *Zucco's* demands. *Zucco*, 552 F.3d at 997 (holding that confidential witness statements relying on vague hearsay statements are not sufficient to satisfy *Daou's* reliability standard, but also noting that the fact that a witness relies on hearsay statements alone does not automatically preclude reliance); *In re Downey Sec. Litig*, No. Cv 08–3261–JFW (RZx), 2009 WL 2767670, at *9 (C.D. Cal. Aug. 21, 2009) (citing *In re Hypercom Corp. Sec. Litig.*, No. CV–05–0455–PHX–NVW, 2006 WL 1836181, at *5 (D. Ariz. Jul. 5, 2006)) ("[T]he statements of a confidential witness are disregarded if lacking in specificity or based on hearsay, rumor, or speculation."). Accordingly, while FE1 may have personal knowledge of certain aspects of the allegations because of his position at InfuSystem for three months, Lechner has not demonstrated that FE1 was in a position to have personal knowledge of the information he provides regarding the other pertinent periods. Nor has Lechner satisfactorily alleged how FE1 would have personal knowledge of aspects of the third-party payor business, when he worked in InfuSystem's Kansas office that handled "receivables for the Company's direct pay customers." (FAC ¶ 30 n.1.)

Further, at issue here is InfuSystem's allegedly false statement regarding an inadvertent error in an Excel spreadsheet that affected only the third-party payor business. (FAC ¶¶ 6, 81.) The FAC does not allege how FE1 would know the details of "who, what, when, or where" the spreadsheet was modified, or created. Nor does

the FAC allege that FE1 was involved in preparing the financial statements that overstated revenues, nor could he have been, as noted above. To the extent Lechner contends there was something other than an inadvertent error on an Excel spreadsheet that caused the incorrect financial statements, Lechner must demonstrate that FE1 was in a position where he would have personal knowledge refuting this equally plausible explanation for the error. *See Zucco*, 552 F.3d at 991 (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007)) ("A complaint will survive…only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.").

Furthermore, even if the requisite foundation was established, the statements FE1 makes must also be indicative of scienter, which they are not. *Id.* at 995. The Court addresses this prong below as part of its analysis of whether the individual allegations, or the FAC viewed holistically, give rise to a strong inference of scienter, as is required. *Id.* at 992.

**B. Lechner's Scienter Allegations Are Not as Compelling as the Opposing Inference**

At issue, is not whether the Individual Defendants made false statements, but rather, whether the Individual Defendants acted with the requisite scienter. "Scienter is 'a mental state embracing intent to deceive, manipulate, or defraud.'" *Rok v. Identiv, Inc.*, No. 15-CV-5775-CRB, 2017 WL 35496, at *10 (N.D. Cal. Jan. 4, 2017) (quoting *Tellabs*, 551 U.S. at 319)). Under the PSLRA, the Court must compare allegations of scienter with other plausible explanations for the false or misleading statements to determine whether there is a "strong inference" of scienter. *Zucco*, 552 F.3d at 991. The Court must find that "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* (quoting *Tellabs*, 551 U.S. at 324).

FE1 "described a corporate culture at InfuSystem that encouraged and accepted falsification of accounts receivable for years." (*Id.* ¶ 7.) Lechner claims that FE1's

statements establish scienter because FE1: 1) "interacted in person with the Individual Defendants on the subject of the Company's deficient A/R practices" (FAC ¶¶ 30, 33–34, 41, 48); 2) "interacted with other Company executives on this topic both in person and in writing" (*Id.* ¶¶ 30, 32, 39–40, 46, 49, 51–53); and 3) "kept emails and Company documents corroborating both the fact of the non-GAAP compliant A/R processes and his and the Individual Defendants' recklessness or knowledge with respect to these deficient processes." (*Id.* ¶ 56.)

One of the most compelling allegations is that "FE1 directly told Defendant Steen that InfuSystem's accounts receivables were seriously overinflated, creating serious potential liabilities and consequences for the Company[ and that] Defendant Steen responded that he knew." (*Id.* ¶ 48.) He also states that "Defendant Foster admitted that he knew that the Company had failed and continued to fail to [write off uncollectible receivables], and that it was one of the issues that he wanted FE1 to correct." (*Id.* ¶ 41.) The Court distills these allegations into two theories of scienter: 1) Defendants knew of or recklessly disregarded InfuSystem's lack of internal controls; and 2) Defendants recklessly disclosed materially false financial statements.

*1. Lack of Internal Controls*

Lechner alleges that the Individual Defendants knew of, or recklessly disregarded, InfuSystem's lack of internal controls to prevent accounting errors affecting accounts receivable. (Opp'n 11–12; *see also* FAC ¶ 46.) Lechner does not explain how the accounts receivables were specifically overinflated, the amounts by which they were overinflated at a specific point in time, or any direct instructions from the Individual Defendants to ignore aging accounts.

For example, in describing the "serious problems with accounts receivable and bad debt," FE1 describes a scenario where "one customer had declared bankruptcy and then simply changed its name and sought credit under the new name. InfuSystem extended the credit and then that customer declared bankruptcy again." (FAC ¶ 50.) This allegation is broad, unparticularized, and does not set forth the "who, what,

where, or when," as required for a particularized pleading of fraud—let alone a strong inference of scienter under the PSLRA. *Cf. In re Daou*, 411 F.3d at 1016 (quoting *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1273 (N.D. Cal. 2000)) (explaining that when pleading irregularities in revenue recognition plaintiffs should allege basic details such as the amount of revenues overstated, products involved in the transaction, dates of transactions, and identities of customers involved in transactions). That InfuSystem's controls "were inadequate is perhaps an indication of incompetence, but incompetence, even gross incompetence, is no basis for a securities fraud claim…." *In re Loudeey Corp. Sec. Litig.*, No. C06–1442MJP, 2007 WL 2404626, at *7 (W.D. Wash. Aug. 17, 2007) (quoting *In re Watchgaurd Sec. Litig.*, No. C05–678LR, 2006 WL 2927663, at *10 (W.D. Wash. Oct. 12, 2006)).

Lechner also points to the statements in InfuSystem's 10-K/A, in which "Defendants admitted that they 'did not have an adequate process or appropriate controls in place to support the accurate reporting of [InfuSystem's] financial results and disclosures on [InfuSystem's] Form 10-K.'" (Opp'n 12 (citing RJN Ex. 8).) Even if the Individual Defendants recognized, in hindsight, that InfuSystem lacked sufficient internal controls to prevent the accounting error that resulted in the stock price drop, Lechner makes no allegations suggesting a motive to commit fraud. Paragraph 113 of the FAC states: "Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of InfuSystem securities from their personal portfolios." Lechner makes no allegations of any specific sales, or other alleged benefit the Individual Defendants received because of their false statements or omissions.

While not dispositive, the absence of stock sales weighs against finding scienter. *See In re Downey Sec. Litig.*, No. CV 08–3261, 2009 WL 2767670, at *13 (C.D. Cal. Aug. 21, 2009) ("[A] strong inference of scienter is negated when there is an absence of stock sales or where such sales are minimal"); *In re Adolor Corp. Sec.*

*Litig.*, 616 F. Supp. 2d 551, 572–73 (E.D. Pa. 2009) (increasing stock holdings "raises compelling inference *against* scienter") (emphasis in original). Here, the Individual Defendants actually increased their stock holdings in 2015 and 2016, when the fraud was allegedly taking place. (RJN Exs. 12–14, 16–25.) This single factor is not determinative, but detracts from a holistic finding of scienter. *See In re Daou*, 411 F.3d at 1024 ("Although plaintiffs' allegations of Daou's top-to-bottom management hierarchy, defendants' suspicious stock sales, or the corporate acquisitions alone would not likely demonstrate defendants' scienter, these plus the complaint's specific allegations of deliberate accounting misfeasance create a strong inference of scienter."). Accordingly, viewing the FAC holistically and comparing Lechner's allegations to other plausible explanations, the Court finds Lechner has not met his high burden to plead scienter under the PSLRA.

*2. Reckless Disclosure of False Financial Statements*

"The mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter." *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 479 (9th Cir. 1994). "This is particularly so in the realm of doubtful accounts or bad debt recognition due to the elasticity of the underlying accounting principles." *Knox v. Yingli Green Energy Holding Co. Ltd.*, 242 F. Supp. 3d 950, 973 (C.D. Cal. 2017) (collecting cases). Allegations that certain individuals were high in the company, and thus knew or should have known that the statements were false are also not enough to demonstrate scienter. *See In re Hansen Natural Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1158–59 (C.D. Cal. 2007) (quoting *In re Autodesk, Inc. Sec. Litig.*, 132 F. Supp. 2d 833, 844 (N.D. Cal. 2000)) ("Plaintiff 'must do more than allege that…key officers had the requisite knowledge by virtue of their 'hands on' positions; a ruling to the contrary would eliminate the necessity for specially pleading scienter as any corporate officer could be said to possess the requisite knowledge by virtue of his or her position.'").

Here, Lechner points to no specific factual allegations that would lead a

reasonable person to find his theory of scienter at least as compelling as the reason for the false statements put forth by the Defendants: an error on an Excel worksheet. Under *Tellabs* and *Zucco*, the Court is required to engage in a substantive analysis of the two opposing explanations for the false statements and determine whether "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc.*, 551 U.S. at 324. The Court cannot make that finding here. Lechner's broad allegations that the Individual Defendants knew of poor accounts receivable practices does not indicate with any specificity that any defendant knew that a financial statement was false at the time InfuSystem released it, how much it overstated revenues, or why specifically it was false.

Further, Lechner provides no reasonable explanation for how the Individual Defendants stood to benefit from the false statements, which might give a reasonable person the ability to find a strong interference of scienter. Instead, the Individual Defendants increased their stock holdings during the allegedly fraudulent period, then disclosed the accounting error to the market, and provided a plausible explanation for the error.

InfuSystem did not restate revenues for any period prior to the second quarter of 2015. (RJN Ex. 8.) Had the accounts receivable practices been a years-long attempt to defraud the public, as alleged by Lechner and FE1, why were the restatements limited to six quarters spanning 2015 and part of 2016? While a strong inference of scienter "need not be irrefutable," "it must be cogent and compelling, thus strong in light of other explanations." *Id.* Lechner has not alleged facts sufficient to draw such an inference for this theory, given the Court's comparative analysis.

Finally, "[b]oilerplate language in a corporation's 10-k form, or required certifications under Sarbanes-Oxley section 302(a)…add nothing substantial to the scienter calculus." *Zucco*, 552 F.3d at 1003–04; *see also Backe v. Novatel Wireless, Inc.*, 642 F. Supp. 2d 1169, 1182 (S.D. Cal. 2009). The Court rejects Lechner's

attempt to use these certifications as a way to allege a strong inference of scienter. Accordingly, the Court **GRANTS** InfuSystem's Motion to Dismiss on these grounds, and provides Lechner leave to amend, as discussed below.

**C. Loss Causation**

InfuSystem also argues that Lechner failed to plead loss causation. Because the Court finds that Lechner has failed to adequately plead scienter, i.e. that a fraud even occurred, his allegations as to causation must fail as well. However, even if the Court were to find sufficient scienter allegations, which it does not, Lechner's allegations as to loss causation would still be inadequate.

"Loss causation is the causal connection between a defendant's material misrepresentation and a plaintiff's loss." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 392 (9th Cir. 2010). It "is established if the market learns of a defendant's fraudulent act or practice, the market reacts to the fraudulent act or practice, and a plaintiff suffers a loss as a result of the market's reaction." *Id.*; *see also Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1063 (9th Cir. 2008) ("[T]he complaint must allege that the practices that the plaintiff contends are fraudulent were revealed to the market and caused the resulting losses."). However, the misrepresentation need only be "one substantial cause of the investment's decline in value"; it need not be the *sole* reason. *In re Daou*, 411 F.3d at 1025 (internal quotation marks omitted). Plaintiffs must plead loss causation with particularity under Rule 9(b). *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 605 (9th Cir. 2014).

Lechner argues he pleads loss causation because the FAC alleges "that the stock price fell upon revelation of false financial statements and ineffective internal controls, both relate to A/R." (Opp'n 22.) Defendants argue that Lechner fails to point out any communication or document that revealed the "real" reasons for the restatement to the investing public, i.e. fraudulent accounting practices. (Mot. 19.) Indeed, the November 7, 2016, revelation described in the FAC specifically states that the restatement was the result of "applying an incorrect cash collection percentage due

to an error when calculating the historical collection percentage from certain billings to third parties," which overstated revenues in a cumulative way. (FAC ¶ 81.) The statement also explained that the company was working with an audit committee to evaluate the full impact of the miscalculation. (*Id.*) It was upon this revelation that the stock price dropped approximately 40%. (*Id.* ¶ 82.)

This supports an inference that the miscalculation of revenues based on an error in an Excel spreadsheet contributed to the stock price drop, not that the market knew of InfuSystem's allegedly fraudulent practices. *C.f. Loos v. Immersion Corp.*, 762 F.3d 880, 890 (9th Cir. 2014) (holding that the announcement of an internal investigation without more is not sufficient to allege loss causation). As explained by the Ninth Circuit in *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*:

> So long as there is a drop in a stock's price, a plaintiff will always be able to contend that the market 'understood' a defendant's statement precipitating a loss as a coded message revealing the fraud. Enabling a plaintiff to proceed on such a theory would effectively resurrect what *Dura* discredited—that loss causation is established through an allegation that a stock was purchased at an inflated price. Loss causation requires more.

540 F.3d at 1064 (internal citation omitted). The November 7, 2016 statement was the revelation to the market that caused the drop in stock price, and there was nothing in that statement indicating fraud—only that an error occurred resulting in overstated revenues. (*See* FAC ¶ 4 ("[T]he Audit Committee warned that it was assessing the Company's internal control over financial reporting 'to determine if any significant deficiencies or material weaknesses in such controls caused or contributed to any potential adjustments that may be required.'").)

Lechner claims that the Court cannot credit the "self-interested statement" of InfuSystem that there was a miscalculation resulting in the inaccurate financial statements, over the allegations of fraudulent accounting practices. However, the allegedly fraudulent accounting practices must be revealed to the market, in some

form, to establish loss causation. *Metzler*, 540 F.3d at 1063 ("[T]he complaint must allege that the practices that the plaintiff contends are fraudulent were revealed to the market and caused the resulting losses."). Lechner cannot have it both ways. On the one hand, he argues that the statement regarding the improper Excel formula was a fraudulent statement that InfuSystem conjured up to provide a reasonable explanation for the overstated financial statements, thus *hiding* the fraud from the market by lying. On the other, he claims that the statement revealed the fraud to the market, establishing loss causation. If the Excel spreadsheet statement was a lie to hide the fraud, then the market has not discovered the fraud—only that there was an improper calculation leading to overstated revenues, followed by an investigation.

While not clear from Lechner's briefing, it appears he is pursuing a fraud on the market theory, as discussed in *Lloyd v. CVB Financial Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016). Under *Lloyd*, "the announcement of an investigation can 'form the basis for a viable causation theory' if the complaint also alleges a subsequent corrective disclosure by the defendant." *Id.* (citing *Loos*, 762 F.3d at 890 n.3). On December 12, 2016, InfuSystem filed its revised financial statements, and Steen stated, "[w]e are confident that we have taken the necessary steps to correct and implement the appropriate internal controls to strengthen our financial reporting." (FAC ¶ 83.) On the same day during a conference call with analysts, Steen further explained that InfuSystem's "internal auditor discovered that a formula error had been made on one of the spreadsheets that [InfuSystem] used to calculate revenue recognition rates from [its] third party insurance payers and patient co-pays of insurance billings," which "led to an overstatement of estimated account receivable collections…." (RJN Ex. 11.) InfuSystem's stock price rose the day InfuSystem made these statements. (RJN Ex. 15.)

Whether the December 2016 statement actually explains the reason for the incorrect financial statements is not at issue when evaluating loss causation. What is important is whether these statements revealed to the market the "real" reason for the

overstatements of revenue, or otherwise constituted a corrective disclosure. *See Lloyd*, 811 F.3d at 1210 (citing *Loos*, 762 F.3d at 890 n.3). In other words, did the December 2016 statement confirm the market's suspicion that the restatement of revenues announced in November 2016, was actually the result of fraud? At this juncture, the Court is not convinced that Lechner has pleaded this connection with particularity, as required by Rule 9(b). *Apollo Grp. Inc.*, 774 F.3d at 605. Therefore, the Court **GRANTS** Defendants' Motion to Dismiss on the basis that Lechner has failed to plead loss causation, with leave to amend.

**D. Lechner's Claim under Section 20(a)**

A claim under Section 20(a) is dependent on a primary violation of Section 10(b) of the Exchange Act or Rule 10b-5. *Zucco*, 552 F.3d at 990 (holding the existence of a primary violation is a prerequisite for control person liability under Section 20(a)). Because the Court finds that Lechner has failed to plead a violation of Section 10(b), the Court also dismisses this claim.

**E. Leave to Amend**

Generally, a court should freely give leave to amend a dismissed complaint, even if not requested by the plaintiff. *See* Fed. R. Civ. P. 15(a); *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (en banc). The Court **GRANTS** Lechner leave to amend. The Court outlines the deficiencies in the FAC above, and Lechner may attempt to cure them. To survive another Motion to Dismiss, Lechner must allege a cogent and compelling theory of scienter and particularly plead loss causation.

//

//

//

//

//

//

//

## VI. CONCLUSION

For the foregoing reasons, the Court **GRANTS** InfuSystem's Motion to Dismiss. (ECF No. 33.) Should Lechner wish to file an amended complaint, he must do so within 21 days of the date of this Order. He must also lodge with the Court, and serve on the defendants, a redlined copy of the amended pleading so that the Court can decipher the amendments to his Complaint.

**IT IS SO ORDERED.**

December 15, 2017

**OTIS D. WRIGHT, II**
**UNITED STATES DISTRICT JUDGE**